THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SNOQUALMIE VALLEY PRESERVATION ALLIANCE,<br><br>        Plaintiff,<br><br>   v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>        Defendant,<br><br>   and<br><br>PUGET SOUND ENERGY, INC.,<br><br>        Intervenor. | Case No. C10-1108-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiff Snoqualmie Valley Preservation Alliance's motion for summary judgment (Dkt. No. 8), Intervenor Puget Sound Energy, Inc.'s response (Dkt. No. 22), Defendant United State Army Corps of Engineers' response (Dkt. No. 23), Plaintiff's reply (Dkt. No. 32), Defendant's cross-motion for summary judgment (Dkt. No. 41), Intervenor's joinder (Dkt. No. 43), Plaintiff's response (Dkt. No. 60), Intervenor's reply (Dkt. No. 63), and Defendant's reply (Dkt. No. 65). Having thoroughly considered the parties'

ORDER, C10-1108-JCC
PAGE - 1

briefing and the relevant record, the Court finds oral argument unnecessary, denies Plaintiff's motion for summary judgment, and grants Defendant's cross-motion for summary judgment for the reasons explained herein.

I.  BACKGROUND

Puget Sound Energy, Inc. ("PSE") owns and operates the Snoqualmie Valley Hydroelectric Project under a license from the Federal Energy Regulation Commission. (Dkt. No. 1 at 5.) PSE is currently constructing improvements to the hydroelectric project. (Dkt. No. 16 at 2.) Defendant United States Army Corps of Engineers ("Corps") authorized PSE through nationwide permits to perform fill and excavation activities associated with the improvements. (Dkt. No. 1 at 8.) Plaintiff Snoqualmie Valley Preservation Alliance ("Alliance"), a nonprofit corporation "formed to preserve quality of life for all residents, farmers, property owners, and businesses in the Snoqualmie Valley of King County, Washington" (*Id.* at 2), challenges Defendant's decision to authorize the permits and alleges that the decision violated the Clean Water Act, the National Environmental Policy Act, and the Administrative Procedure Act. (*Id.* at 13–16.) The Court previously granted PSE's motion to intervene. (Dkt. No. 52.)

The parties submitted hundreds of pages of briefing and supporting documents, much of which provided the Court with a detailed background of the formation of the hydroelectric project and the various agencies and approvals received to date to construct and modify it. A substantial portion of the briefing debates whether the agencies sufficiently evaluated the risk of downstream flooding associated with the project. Although the details provided in the record are enlightening and helpful to the Court's understanding of the context, the parties agree that "[t]he primary issue in this case is whether the Corps followed the proper permit process when it issued the Nationwide Permit verification letter to PSE."[1] (Dkt. No. 60 at 4; *see also id.* at 7

---

[1] The Federal Energy Regulatory Commission evaluated PSE's project through an Environmental Impact Statement in 1996 and an Environmental Assessment in 2009. *See* 16 U.S.C. § 803(a)(1) (requiring that all licenses be best adapted for beneficial public uses, such

ORDER, C10-1108-JCC
PAGE - 2

("However, the primary issue—whether the Corps followed the proper permit process—is determinative, and the Court need not resolve the dispute over whether the Corps has or has not evaluated downstream flooding impacts to rule in favor of the Alliance.").)

## II. DISCUSSION

### A. Legal Standard

Plaintiff bears a high burden in this action.

> The standard of review for an agency determination to issue a section 404 permit is that found in the Administrative Procedures Act, 5 U.S.C. section 706(2), which provides that the reviewing court shall set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
> This standard of review is highly deferential. While the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment, and while this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.

*Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir. 1986) (citations, punctuation, and footnote omitted). The Court cannot vacate an agency's decision unless it

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010). The Court "is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

The issues in this case exemplify the deference accorded to agencies:

> Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given

---

as "flood control"). The Alliance contends that these studies did not thoroughly consider downstream flooding. This lawsuit does not, however, directly challenge the alleged absence of downstream-flooding analysis; it challenges only the Corps' decision to verify the application of certain general permits for discharges associated with the renovation project.

ORDER, C10-1108-JCC
PAGE - 3

controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (punctuation and citations omitted).

The parties agree that summary judgment is appropriate for adjudication. "When reviewing an agency decision, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Ctr. For Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (punctuation omitted). The Court need not resolve any factual disputes in review of an administrative proceeding. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) ("Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.").

**B.     NWP 17**

The Corps verified that PSE could proceed with its construction project under nationwide general permits[2] ("NWP") 3, 33, and 39. The Alliance's main contention, however,

---

[2] The Fourth Circuit has explained nationwide general permits:

The general permits at issue in this case are all Nationwide Permits (NWPs). Activities falling within the scope of an NWP are automatically authorized without any individualized inquiry, although preconstruction notification of the Corps is required in some cases. 33 C.F.R. § 330.1(e) (2003). In cases where preconstruction notification is required, the Corps will verify the applicability of the NWP to the proposed activity. 33 C.F.R. § 330.1(e)(2). Since NWPs are "designed to regulate with little, if any, delay or paperwork certain activities having minimal [environmental] impacts," NWP verification is much simpler than the individual permit process. 33 C.F.R. § 330.1(b) (2003). If the Corps has

is that the only general permit available to PSE was NWP 17. NWP 17 authorizes the following:

> Discharges of dredged or fill material associated with hydropower projects having: Less than 5000 kW of total generating capacity at existing reservoirs, where the project, including the fill, is licensed by the Federal Energy Regulatory Commission (FERC) under the Federal Power Act of 1920, as amended.

72 Fed. Reg. 11,092, 11,184 (March 12, 2007). Because NWP 17 is the only general permit that specifically references hydropower projects and because the total generating capacity of the PSE hydropower project greatly exceeds the 5000 kilowatt limit contained in NWP 17, the Alliance contends that NWP 17 cannot apply and that no other general permit may apply. Therefore, according to the Alliance, PSE needed to receive from the Corps an individualized permit, which requires a more comprehensive procedure for reviewing environmental impacts.

The Court disagrees with the Alliance. Although NWP 17 is the only general permit specifically referencing hydropower projects, no language contained therein prevents the Corps from applying other permits to hydropower projects that meet those other permits' standards. The Corps' use of multiple general permits to verify PSE's project is not arbitrary, capricious, an abuse of discretion, or contrary to law. The Alliance's interpretation that NWP 17 is the exclusive general permit for hydropower projects may be reasonable when viewing that permit in isolation. But so too is the Corps' interpretation that other permits may apply to hydropower projects that exceed 5000 kilowatts. Because the Court cannot decide which among several competing interpretations best serves the regulatory purpose, it must give the agency's

---

concerns about a proposed project, however, the Corps may exercise "discretionary authority" to restrict the other-wise automatic application of the NWP program while its concerns are addressed. 33 C.F.R. §§ 330.1(d), 330.5 (2003). The Corps' regulations also direct the Corps to review any incoming individual permit application for potential eligibility under existing NWPs, even if the application itself does not so request. 33 C.F.R. § 330.1(f) (2003).

*Crutchfield v. Cnty. of Hanover*, 325 F.3d 211, 214–15 (4th Cir. 2003).

ORDER, C10-1108-JCC
PAGE - 5

interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *See Thomas Jefferson Univ.*, 512 U.S. at 512. The Corps' interpretation is reasonable and consistent with other regulations.

Indeed, where the Corps has intended to limit the use of particular permits, it has done so expressly. *See* 72 Fed. Reg. at 11,189 (NWP 39) ("The construction of new golf courses, new ski areas, or oil and gas wells is not authorized by this NWP."). Moreover, the Corps' interpretation is consistent with its longstanding position that multiple permits may be used to satisfy a particular activity. Corps regulations explicitly authorize the use of multiple permits. 33 C.F.R. § 330.6(c) ("Multiple use of nationwide permits. Two or more different NWPs can be combined to authorize a 'single and complete project' as defined at 33 CFR 330.2(i).") In addition, General Condition 24, applicable to all general permits, endorses the use of multiple permits when acreage loss falls below a certain threshold. *See* 72 Fed. Reg. at 11,194 ("The use of more than one NWP for a single and complete project is prohibited, except when the acreage loss of waters of the United States authorized by the NWPs does not exceed the acreage limit of the NWP with the highest specified acreage limit.").[3]

Corps guidance dating to 1992 confirms the Corps' current position. In a 1992 Question and Answer document, the Corps explained its position:

> Q: Can an applicant perform an activity under any applicable NWP, even though one may appear to be specific to his proposed activity (e.g. using NWP 26 instead of NWP 14 for a minor road crossing)?
>
> A: Although several NWPs may be applicable, an applicant can, at his choice, use any NWP for any activity that meets the terms and conditions of that NWP.

(AR Tab 895 at 19376–77.) In 1992, NWP 14 specifically applied to "Road Crossing[s]." 56

---

[3] The comments to the current rule further confirm the practice. *See* 72 Fed. Reg. at 11,168 ("We agree that the ability to use multiple NWPs reduces our workload and expedites decisions for the regulated public while maintaining the necessary protections for the aquatic environment.").

ORDER, C10-1108-JCC
PAGE - 6

Fed. Reg. 59,110, 59,142 (Nov. 22, 1991). Yet, as explained in the Q&A, an applicant could proceed under NWP 26 ("Headwaters and Isolated Waters Discharges"), *id.* at 59,143, to authorize discharges associated with a road crossing if that crossing met NWP 26's terms and conditions. This guidance demonstrates that an applicant may use any general permit for any activity that meets the terms and conditions of that general permit.[4]

Finally, the Court disagrees with the Alliance's contention that the history of NWP 17 demonstrates that no general permit may apply to a hydropower project exceeding 5000 kilowatts. The Corps previously contemplated expanding NWP 17 to cover *any* hydropower project licensed by the Federal Energy Regulatory Commission, regardless of output, but the Corps instead maintained a 5000 kilowatt limit. Because the Corps rejected the expansive amendment and limited the permit to 5000 kilowatt projects, the Alliance argues that the Corps explicitly rejected using general permits for large-scale hydropower projects.

The Alliance's view is but one position to take from that history. Another equally, if not more, reasonable position is that the Corps decided that hydropower projects could not have carte blanch coverage under NWP 17. A project operating below 5000 kilowatts may proceed under NWP 17; however, a project operating above 5000 kilowatts may proceed under a different general permit if the project meets that permit's criteria. If a project operating above 5000 kilowatts cannot meet the criteria of another general permit, then that project may only proceed under an individualized permit. Here, the Corps concluded that PSE's project met the criteria of several general permits other than NWP 17.

---

[4] Question 13 further confirms the Corps' position that more than one NWP may apply:

Q: If a project meets the terms and conditions of two separate NWPs and thus could be authorized by either NWP, which NWP is the project authorized by?

A: The general permittee, at his/her discretion, may pick which NWP to qualify for, unless the district engineer exercises his discretionary authority.

(AR Tab 895 at 19377.)

Accordingly, given the Court's deferential standard of review, the reasonable position of the Corps, and the other regulations and guidelines that authorize the use of multiple permits, the Alliance falls far short of its burden of proving that the Corps' decision to verify PSE's hydropower project under permits other than NWP 17 was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.[5]

### C. NWPs 3, 33, and 39

The Alliance further contends that even if the Corps could verify PSE's project under general permits other than NWP 17, PSE's project does not qualify for NWPs 3, 33, or 39. The Court disagrees.

NWP 3, "Maintenance," authorizes, in relevant part,

> [t]he repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure, or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification. Minor deviations in the structure's configuration or filled area, including those due to changes in materials, construction techniques, or current construction codes or safety standards that are necessary to make the repair, rehabilitation, or replacement are authorized.

72 Fed. Reg. at 11,181. In short, NWP 3 authorizes, among other things, the replacement of any previously authorized, currently serviceable structure, provided that the structure will be

---

[5] The Court rejects the Alliance's argument that under the canon of *inclusion unius est exclusion alterius*—the inclusion of the one is the exclusion of the other—the inclusion of a general permit referring to hydropower projects operating under 5000 kilowatts means that no other general permit applies to such projects operating over 5000 kilowatts. The Court must defer to the Corps' interpretation of its own permits and regulations. Moreover, the Supreme Court explained that the canon "does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). NWP 17 does not include a group or series of items while excluding others. Finally, the canon "is simply too thin a reed on which to hang [its] statutory construction argument," *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 672 (9th Cir. 1993), because Corps regulations explicitly authorize the use of multiple permits to satisfy a particular activity.

ORDER, C10-1108-JCC
PAGE - 8

used in the same manner as previously authorized, with allowance for minor deviations.

PSE's dam was already authorized, constructed, and serviceable. PSE sought to replace the original dam with a modified version. The Alliance stresses repeatedly that PSE's project is a "new" project because the replaced dam will be three feet lower and thirty-seven feet longer. Yet the Corps concluded that the replacement dam will serve the same function as the original dam, namely, diverting water around Snoqualmie Falls for the purpose of generating electricity.

The Court concludes that the Corps' decision to verify PSE's permit under NWP 3 was neither arbitrary nor capricious. Initially, the Corps' decision to classify the PSE hydropower project as a replacement is reasonable; replacements inherently include "new" items intended to take the place of the old item. So too was the Corps' decision on minor deviations rational and reasonable. *See Friends of the Earth*, 800 F.2d at 831 ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.").

Although the Corps did not expressly include its "minor deviation" analysis in its Decision Document, the Corps needs not record such explicit conclusions. *See Crutchfield*, 325 F.3d at 215 (explaining that general permits are designed to regulate these activities with little, if any, delay or paperwork); *Butte Envtl. Council*, 620 F.3d at 945 (holding that the Court "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *see also Trinity Am. Corp. v. U.S. E.P.A.*, 150 F.3d 389, 395 (4th Cir. 1998) ("Under this highly deferential standard, therefore, our task is limited to scrutinizing the EPA's activity to determine whether the record reveals that a rational basis exists for its decision." (punctuation omitted)).[6] The Decision Document explains that "[t]he purpose of the project is to provide upgrades to an existing hydroelectric facility." (AR Tab 872 at 18224.) The Corps

---

[6] That the Corps spelled out in the Decision Document which components of PSE's project were authorized by particular general permits shows how the Corps arrived at its conclusions.

ORDER, C10-1108-JCC
PAGE - 9

based its decision in part on the previous Regulatory Commission documents and on PSE's notification letter, which described those upgrades as necessary to reduce certain flooding and to secure the dam to native rock in an effort to restore more natural conditions. NWP 3 allows for minor deviations "to provide the flexibility necessary for this nationwide permit to keep pace with construction technology and public safety." 56 Fed. Reg. at 59,120. It is rational to conclude, given PSE's documentation, that the changes were minor deviations to the dam's underlying purpose that resulted from new construction technology and concerns for public safety. Moreover, the "minor deviation" language is not limited to technological or safety considerations; they are merely examples. The replacement dam will serve the same function as the previous dam, and the Corps' conclusion that changes in the dam's height and length are minimal departures from its underlying function is neither arbitrary nor capricious.[7] The Court must defer to the Corps' conclusion with respect to NWP 3, particularly because its conclusion rests on a highly technical regulatory program in which the classification of relevant criteria necessarily requires significant expertise.[8] *See Thomas Jefferson Univ.*, 512 U.S. at 512.

The same is true of NWP 39. That permit, titled "Commercial and Institutional Developments," authorizes "[d]ischarges of dredged or fill material into non-tidal waters of the United States for the construction or expansion of commercial and institutional building foundations and building pads and attendant features that are necessary for the use and

---

[7] The Court cannot accept the Alliances' assertion that a longer and lower dam (17 percent difference) must be per se more than a minor deviation considered in NWP 3. The general permit does not include rigid restrictions but contemplates a variety of changes that account for innovations in technology, materials, and safety standards but that serve the same purpose as the previously authorized structure. *Cf. Mohlen v. United States*, 74 Fed. Cl. 656, 658 (Fed. Cl. 2006) (affirming Corps' conclusion that a replacement pier was not a minor deviation where it constituted a 45 percent increase in length).

[8] Even if the PSE's "new channel alignment" is inconsistent with the portion of NWP 3 that prohibits its use for "new stream channelization or stream relocation projects (*see* AR Tab 878 at 18317), the Corps verified those offsets via NWP 39, not NWP 3, *see infra*.

maintenance of the structures." 72 Fed. Reg. 11,188. "Attendant features" are broadly defined and "may include, but are not limited to, roads, parking lots, garages, yards, utility lines, storm water management facilities, and recreation facilities." *Id.* "Commercial developments" include "industrial facilities." *Id.* NWP 39 authorizes discharges for such activities so long as the loss does not exceed 0.5 acres of nontidal waters of the United States. *Id.* The Corps concluded, and the Alliance does not dispute, that PSE's proposed discharges will result in permanent impacts to only 0.21 acres of water.

The Alliance charges that the Corps' verification under NWP 39 is improper because the permit applies only to "building foundations and building pads." This is too narrow a view. A reasonable interpretation of the text indicates that the permit also applies to discharges for the construction or expansion of "attendant features that are necessary for the use and maintenance of the structures." The verification under NWP 39 applied to PSE's "modifications to Plant 1 and 2 intakes and powerhouse-tailrace structures." (AR Tab 872 at 18224). PSE proposed to discharge fill material to modify the "powerhouse dissipation chamber," develop "recreational facilities," install a new "concrete bulkhead," and construct an "access road." *Id.* It was reasonable for the Corps to conclude that NWP 39 applies to these components, many of which are explicitly included in the definition of attendant features. The Corps' conclusion that the hydropower project qualifies as an "industrial activity" is also reasonable given the common understanding of the term. *See Thomas Jefferson Univ.*, 512 U.S. at 512 ("Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.") Again, the Alliance's interpretation may be reasonable, but so too is the Corps' interpretation. In such a case, the Court must defer to the Corps. *Id.*

Finally, the Corps' verification under NWP 33 was also reasonable. NWP 33 applies to the construction of temporary structures, and the Corps' Decision Document expressly applies

1  NWP 33 only to the use of structures that are "temporary." The Alliance concedes that NWP

2  33 "legitimately applies to some aspects of the Revised PSE Project—specifically, the

3  installation of various temporary structures that will allow work on the permanent renovations

4  to proceed." (Dkt. No. 8 at 19.) The Alliance simply contends that NWP 33 cannot authorize

5  permanent structures. (*Id.*) Neither the Corps nor PSE disputes this point; NWP 33 applies only

6  to PSE's temporary structures.

### A.     General Conditions 8, 9, and 10.

The Court rejects the Alliance's assertion that the PSE project does not satisfy General Conditions 8, 9, and 10. General Condition 8 requires that adverse effects to an aquatic system be minimized. The Court cannot conclude on the basis of this record that PSE's project fails to minimize those effects. With respect to General Condition 9, the Alliance contends merely that the river-widening project "calls into question" compliance with that condition. (Dkt. No. 60 at 34.) This inconclusive assertion is insufficient for summary-judgment purposes. Nor is there any indication cited by the Alliance that PSE has not complied with state and local floodplain-management requirements under General Condition 10.

### III.    CONCLUSION

The Alliance is undoubtedly concerned about the possibility of downstream flooding resulting from PSE's project. But the possibility of downstream flooding is not, by the Alliance's admission, the issue before this Court. The issue before this Court is whether the Alliance has met its burden of proving that the Corps' decision to verify PSE's discharge under NWPs 3, 33, and 39 was arbitrary, capricious, an abuse of discretion, or contrary to law. Because the Court concludes that the Corps' validation of PSE's hydropower project under those general permits was suitable, the Alliance has not shown that the Corps violated the Clean Water Act, the National Environmental Policy Act, or the Administrative Procedure

Act.[9] Accordingly, for the foregoing reasons, the Court DENIES the Alliance's motion for summary judgment (Dkt. No. 8) and GRANTS the Corps' cross-motion for summary judgment (Dkt. No. 41).

DATED this 29th day of March 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[9] The Court needs not reach PSE's laches defense.